

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. |
| | : | **1:14CR- 86** |
| Plaintiff, | : | **J. WEBER** |
| | : | |
| v. | : | INFORMATION |
| | : | |
| | : | 18 U.S.C. § 1343 |
| JOHN R. BULLAR, | : | 18 U.S.C. § 1957 |
| | : | |
| Defendant. | : | Notice of Forfeiture |

**The United States Attorney charges:**

## COUNT 1
## WIRE FRAUD
## 18 U.S.C. § 1343

At all times relevant:

1. The defendant, **JOHN R. BULLAR ("BULLAR")**, resided and worked in the Southern District of Ohio.

2. **BULLAR** was the sole owner and operator of Executive Management Advisors, LLC ("EMA"), which had its principal place of business in Cincinnati, Ohio. **BULLAR** also was the sole owner and operator of Priapus Group, LLC.

3. **BULLAR** marketed himself as someone experienced in the financial services industry, who was successful in investing in commodity futures.

4. Since at least 1998, **BULLAR** has offered investment opportunities to investors in the Southern District of Ohio and elsewhere, through his company, EMA.

**The Scheme to Defraud**

5.   Beginning in or about 2003 through September 2013, in the Southern District of Ohio and elsewhere, the defendant, **JOHN R. BULLAR**, perpetrated a scheme to defraud his investors by soliciting millions of dollars under false pretenses, failing to invest investors' funds as promised, and misappropriating and converting investors' funds to **BULLAR's** own benefit without the knowledge or authorization of the investors, using interstate wire communications to execute the scheme to defraud.

6.   To persuade individuals to invest with him, **BULLAR** frequently made numerous false representations.  For example, **BULLAR** told potential clients that he never had a losing quarter.  **BULLAR** also offered potential investors a false sense of security by telling potential investors that he, himself, was the biggest investor in EMA.   At times, **BULLAR** made it seem as though he was doing a favor for investors, by telling them he would manage their funds even though it was below his minimum level of investment.

7.   The majority of **BULLAR's** investors were friends, family members and fellow church members.  **BULLAR** told his clients that he had invested their money in precious metals, gold, silver, bonds, and foreign currency and that he made money based on the volatility of the market, regardless of whether the market was up or down.  **BULLAR** told clients that he preferred to keep the number of his investors small, so that he could "fly under the radar."  **BULLAR** also told clients that he had a computerized algorithm system that monitored the market for patterns and alerted him to potential losses.  **BULLAR** told investors that although he had been offered millions of dollars for the system he would not sell it, because he could make more money using the system rather than selling it.  These representations were false, however, because in reality, **BULLAR** had invested only a small

2

amount of the money that he received from clients, using the vast majority of the money to pay other investors and his own personal expenses.

8.   To induce current clients to keep investing, and thus conceal his fraudulent investment scheme, **BULLAR** provided investors with quarterly statements purporting to show their account balances.  The statements often showed substantial gains over a short period of time. For example, Investor A wrote checks to **BULLAR** between March 2013 and April 30, 2013, totaling $181,533.99.  According to Investor A's quarterly statement dated June 28, 2013, Investor A's account balance was $229,276.66, a gain of approximately 26% in less than three months. The quarterly statements – such as Investor A's – were false, showing positive account balances and fictitious earnings, when in fact, the money had not been invested as promised. Although **BULLAR** collected over $8.7 million from investors between mid-2006 and September 2013, only $580,500.00 was sent to brokers for trading. The remaining $8.1 million was never invested at all.  The small fraction of investor money that **BULLAR** actually sent to brokers for trading failed to generate profits; the money was either lost via trading or later withdrawn by **BULLAR**.  Yet, based upon the fictitious earnings reported in the fraudulent statements, the investors continued to invest more with **BULLAR**.

9.   **BULLAR** furthered his scheme by creating an appearance of legitimacy.  For example, **BULLAR** created an investment blog for his clients (www.emafutures.com), which he updated regularly, sharing various articles and reports about the market.  **BULLAR** outfitted his home office, which investors frequented, with a television and three computer monitors to give investors the impression that he was constantly monitoring the market. **BULLAR's** home also gave investors the impression that he was a successful trading

3

advisor. His expansive 5 bedroom/5 bathroom house – had professional landscaping which was paid for with investor funds. **BULLAR** also purchased an adjoining lot with investor money and used investor money to remodel the cabin on the lot, install a swimming pool and outdoor kitchen, and pay for professional landscaping on the lot. **BULLAR** further perpetuated his image as a successful advisor by entertaining groups of investors at his home, treating investors to lavish dinners and paying for some investors to vacation with him.

10. It was further part of the scheme to defraud that from mid-2006 through September 2013, **BULLAR** received over $8.7 million from investors. **BULLAR** received investor funds through interstate wire transfers and through mailings delivered by the United States Postal Service. The vast majority of these funds were never invested in anything. Rather, the funds were paid to other investors in the form of principal payments and/or gains or spent by **BULLAR** to pay for personal expenses.

11. It was further part of the scheme to defraud that **BULLAR** caused Forms 1099 to be issued to investors for tax purposes, which reported fictitious gains. Investors relied on these documents to file their tax returns and paid taxes on the fictitious gains reported to them.

12. It was part of the scheme to defraud that instead of investing the money he received from investors, **BULLAR** used investor money to pay for the mortgage on his home, home renovations, the purchase of property adjoining his residence, a swimming pool, professional landscaping, outdoor entertaining spaces, vacations, country club dues, boats, jet skis, sports tickets, and vehicles, among other things.

**Execution of the Scheme to Defraud**

On or about March 30, 2012, in the Southern District of Ohio, the defendant, **JOHN R. BULLAR,** for the purpose of executing the scheme to defraud described above, did knowingly cause the use of interstate wire communications, to wit, the wiring of funds in the amount of $323,987.22 from the bank account of investor W.J. for electronic deposit in the bank account of EMA at First Financial Bank.

**All in violation of Title 18, United States Code, Sections 1343 and 2.**

**COUNT 2**
**MONEY LAUNDERING**
**18 U.S.C. § 1957**

1. Paragraphs 1 through 13 of Count 1 are incorporated here.

2. On or about November 30, 2011, in the Southern District of Ohio and elsewhere, the defendant, **JOHN R. BULLAR**, did knowingly engage and attempt to engage in a monetary transaction by through or to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, to wit:

> **BULLAR** obtained a $500,000.00 wire transfer payment from Investor D, and a $200,085.05 wire transfer payment from an Investor E., which were deposited into the EMA account at First Financial Bank on September 26, 2011 and September 28, 2011 respectively, such property having been derived from a specified unlawful activity, that is, wire fraud as described in Count 1, in violation of Title 18, United States Code, Section 1343. On November 30, 2011, **BULLAR** then wire transferred $300,000.00 of the funds to the checking account of Priapus Group LLC, at First Financial Bank, which he controlled. On or about that same day, **BULLAR** wire transferred $297,948.52 of the funds from the Priapus Group, LLC account to Riverview Title Agency, Inc. for the purchase of property adjoining his personal residence.

**All in violation of Title 18, United States Code, Section 1957.**

## FORFEITURE ALLEGATION 1
### Specified Unlawful Activity Proceeds

Upon conviction of one or more of the offenses alleged in Count 1 (wire fraud) of this Information, defendant **JOHN R. BULLAR**, shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(1)(C) and 28 U.S.C. § 2461(c), any property constituting or derived from proceeds obtained directly or indirectly as a result of the said violations, including but not limited to a sum of money equal to the total amount of money in United States currency, representing the amount of proceeds obtained as a result of the offense (wire fraud).

**All in accordance with 18 U.S.C. § 982(a)(1)(C), 28 U.S.C. § 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure.**

## FORFEITURE ALLEGATION 2
### Money Laundering

Pursuant to 18 U.S.C. § 982(a)(1), if convicted of the offense set forth in Count 2, defendant **JOHN R. BULLAR** shall forfeit to the United States the following property:

1. All right, title, and interest in any and all property involved in the offense in violation of 18 U.S.C. § 1957, for which the defendant is convicted, and all property traceable to such property, including the following: (1) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Section 1957; (2) all commissions, fees and other property constituting proceeds obtained as a result of the violation; and (3) all property used in any manner or part to commit or to facilitate the commission of the violation.

6

2.   A sum of money equal to the total amount of money involved in each offense, or conspiracy to commit such offense, for which the defendant is convicted.

**All in accordance with 18 U.S.C. § 982(a)(1), and Rule 32.2(a), Federal Rules of Criminal Procedure.**

## SUBSTITUTE ASSETS

If any of the above-described forfeitable property, as a result of any act or omission of the defendant:  (1) cannot be located upon the exercise of due diligence; (2) has been transferred or sold to, or deposited with, a third party; (3) has been placed beyond the jurisdiction of the court; (4) has been substantially diminished in value; or (5) has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to 18 U.S.C. § 982(b) and 28 U.S.C. § 2461(c) to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

8/7/14
**DATE**

**BRENDA S. SHOEMAKER**
**Financial Crimes Chief**

7